**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,**

**v.**

**INDUCTO–BEND, INC., et al., Defendants,**

**and**

**Joseph Dale Robertson, Trustee, Intervenor.**

**Civ. A. No. H–90–1128.**

United States District Court, S.D. Texas, Houston Division.

Jan. 2, 1991.

652

Gary E. Tulloch, Houston, Tex., for plaintiff.

John S. Mastrangelo, Houston, Tex., for defendants.

## OPINION ON FINAL JUDGMENT

HUGHES, District Judge.

### 1. *Introduction.*

The Federal Deposit Insurance Corporation (FDIC) sought to recover immediate possession of land acquired by the failed bank at foreclosure. After removal, an adverse claimant to title under a contract with the FDIC intervened. Title, against the parties defendant, is in the FDIC, and it has the right to immediate possession and past rentals.

### 2. *Background.*

To secure a loan to Robert S. Gold, Port City Bank took a deed of trust on an industrial property in Northwest Houston. After the deed of trust was recorded, Gold leased the land to P & M Blasting and Coating, and it in turn subleased part of the land to Inducto–Bend. In 1987, Gold defaulted on his debt, and the bank foreclosed. Shortly after that, the bank failed, passing into a receivership under the FDIC. Joseph Dale Robertson, who is a principal of Inducto–Bend, negotiated with the bank and the FDIC for both his own account and that of Inducto–Bend.

When the FDIC decided that negotiations had reached an impasse, it brought a forcible detainer suit against Inducto–Bend. Inducto–Bend removed the action here. The forcible detainer part was heard in October as an emergency matter as state law contemplates. The right to immediate possession was found to have been in the FDIC, and a writ of possession was issued. The writ was summarily stayed by the court of appeals.

At the detainer hearing, Robertson was allowed to intervene on his claim to title under a contract to buy the land from the FDIC, and the trespass to try title part of this action was then set for a bench trial in late November, which was held.

### 3. *Jurisdiction.*

■ At the beginning of the trial of title, Inducto–Bend and Robertson raised the question of this court's jurisdiction since the original court would not have had jurisdiction to try the title issue. The United States District Court has jurisdiction to hear both the forcible detainer and the title issues when the judicial power is invoked through the presence of a federal party.

This case was removed from a justice of the peace court of Texas which has exclusive original jurisdiction of forcible detainer actions. Its upper jurisdictional limit for civil monetary actions is $2,500, but this rather low limit does not apply to the value of the right to possession. Tex.Gov.Code § 27.031. The case, as it arrived in the United States District Court, was a forcible detainer action by the owner against the occupants of realty. The forcible detainer action was heard in October and decided. At that hearing the adverse claimant Robertson was allowed to participate, and at the conclusion, he was allowed to intervene as a title claimant. At that point, with the remaining question being one of title, it became the kind of case that under Texas law must be heard in a Texas District Court. This court, sitting with a federal party, is a justice of the peace court, a county court at law, a constitutional county court, and a district court. It may also have the occasion to sit as a municipal court.

In Texas, the right to possession is a summary proceeding in a justice of the peace court. The questions of title must be tried in the Texas district court. To establish a right to possession some question of title must arise. The jurisprudence of Texas is clear that no determination implicit in a possessory order by a justice of the peace court is binding as a determination of title as res judicata or other bar. Title itself must be litigated in the district court anew, but the right to possession implies questions of title.

There are cases where title claimants had no immediate right to possession. They could not maintain a detainer action; their sole remedy is the action for title. *Dent v.*

*Pines,* 394 S.W.2d 266 (Tex.Civ.App.— Houston, 1965, no writ). Once the possessory action is quickly decided, the parties claiming title can fight in district court. Later events in this forum that would have been outside the jurisdiction of the justice of the peace forum itself does not divest this court of jurisdiction once it has properly vested on a removal. The removal was proper; it got here and was, in fact, heard as something that could have been heard in a justice of the peace court.

### 4. *Possession.*

The issue of possession was tried as a separate part of this action, and the award of immediate possession is on appeal. Inducto–Bend did not actually attempt to relitigate the right to possession during the second phase of the case, but it followed the title claimant as a derivative claimant under him. If the result of the title question had been in favor of Robertson, then the judgment in this part would have nullified the earlier possessory order at the behest of the FDIC; conversely, since the possessory order is now superseded by the definitive determination of title and possession Inducto–Bend must vacate the property on the strength of this judgment.

### 5. *Inducto–Bend.*

The issues that do involve Inducto–Bend here are (a) the appropriate rental value and (b) the time for which rents are due.

#### A. *Rental Value.*

There are six bits of data about the rental value. There are (1) the offer at $1,040, (2) its rejection, (3) the $1,200 in the lease, (4) the $1,800 in the lease, (5) the $750 or $1,000 paid between Valfor, who was occupying part of the property under a side deal with Inducto–Bend, and Inducto–Bend, and (6) the acceptance of one $1,040 check by the FDIC.

Originally Inducto–Bend occupied a portion of the premises. The evidence here is that its occupancy may have expanded somewhat during the period after the failure of the bank, but the court finds that the most reasonable approxi-

mation of a fair rental value for the occupancy of the property by Inducto–Bend from the foreclosure until the property is restored to the bank's successor is $1,200 a month.

### B. Rental Period.

Inducto–Bend has occupied the property continuously since the bank acquired title in October of 1987. Inducto–Bend made four payments of $1,200 to the bank and one of $1040 to the FDIC. The FDIC will have judgment against Inducto–Bend for $1,200 a month times the number of months since October of 1987, less $1,040 deducted as the earliest rent due. It has been 38 months since the foreclosure, so there is rent unpaid for 34 months at $1,200 a month. Since the FDIC accepted the $1,040 check, it lost the extra $160 for that month.

### 6. Ratification by Rent.

■ Inducto–Bend, directly or through Robertson, in some capacity, tendered approximately nine out of forty rental payments that were due. The amount of those checks varied. The owner negotiated one check for $1,040 and rejected the rest. Inducto–Bend would have these checks ratify the lease allowing Inducto–Bend to remain on the land as the tenant of the FDIC. Accepting a check does not ratify a lease without more. Additionally, the lease, if it had been ratified, has long-since expired, leaving Inducto–Bend still a tenant at sufferance. There is, of course, the problem that even a tenant at sufferance or one who has attorned the landlord must still pay the rent. Inducto–Bend has neither paid nor tendered rent.

The occasional delivery, frequently with conditions in a contemporaneous letter, was not a tender of performance, not even sufficient to eliminate the right of the owner to collect interest on past due rents. It was a simple thing to do to issue a check and deliver it to the FDIC each month for a designated period of occupancy in order to preserve the claim of a tender. The court concludes that no tender was made of the rent. The conclusions are that Inducto–

Bend was a tenant at sufferance and that the lease was not ratified by Port City Bank or by the FDIC.

The communications from Inducto–Bend and Robertson were never unequivocable; the execution of the check by the FDIC is binding evidence on the FDIC of payment for that period of occupancy, but it is not authority to bind the FDIC to the contents of the letters that transmitted them or to any other source of calculation. As Robertson said in one of his transmittal letters, "$1,200 is what we were paying earlier; that is all we know to do, so here is the rent money." That is not a request for ratification.

### 7. Formal Waiver.

■ Inducto–Bend's sole right to occupancy was generated by the sublease from P & M Blasting and Coating, who held under a lease from Gold, but all of those leases were subject to the deed of trust of Port City by Gold as an earlier encumbrance. The bank waived the landlord's lien against the personalty that the tenant may have placed on the property. That does not mean that the bank ratified the entire lease, nor has the bank or its successor made claim to a possessory interest in the personalty of the tenants or subtenants on the property. The lease and sublease were cut off by the foreclosure in October of 1987, and Inducto–Bend became a tenant at sufferance when Port City acquired the title. The lien waiver is irrelevant.

### 8. Occupancy under Robertson.

Inducto–Bend claims a right to occupy the land derived from permission by Robertson, Trustee. That right to occupancy is wholly dependent on Robertson's interest. Since Robertson's claim to title fails, Inducto–Bend's claimed rights under Robertson do not exist.

### 9. Third–Party Beneficiary.

That Robertson, Trustee, sought to purchase the property for the use and benefit of Inducto–Bend is apparent but irrelevant. Whether we substitute Inducto–Bend for Robertson, Trustee, or we just treat this as

an independent transaction by Robertson, Trustee, which he planned and expected to benefit Inducto–Bend, does not change the legal effect of the transaction.

10. *Contract to Sell.*

■ There was a discussion of a new lease from the FDIC to Inducto–Bend, and a draft was sent to Robertson, but he never returned it, rejecting it in a letter. At some point in the FDIC's liquidation of Port City Bank, Robertson began negotiating with Caroline Evans to buy the land from the FDIC. Robertson used a FDIC form with several addenda to make an offer. Evans marked on one copy of an addendum the changes sought by the FDIC and sent it to Robertson by facsimile transmission. Robertson responded by accepting the offer and demanding formal acknowledgment of the FDIC's receipt of his acceptance. Evans acknowledged receipt of the paper, but did not sign the acceptance blank.

Robertson says all this paper makes a contract enforceable against the FDIC. The FDIC says that Evans was negotiating and that Robertson knew she could not bind the agency.

Is there an agreement for sale between the FDIC and Robertson? There is not.

11. *Authority.*

There were at least four places in the documentation that reasonably indicated that Evans was negotiating and not concluding, the most important of which is her careful draftsmanship of her receipt for what only Robertson called his acceptance of their offer. Evans was negotiating. Robertson Exhibit 10–5. It is difficult for this court, despite its own penchant for striking and interlineating, to treat the copy of exhibit to the sale proposal on which Ms. Evans made her handwritten changes and sent back by facsimile as a complete formal counteroffer by the FDIC. It is not complete in itself, and it cannot be made complete by reference to other contemporaneous papers.

The other indicia are, of course, the printed form itself and the disclosure on the proposed lease by the FDIC of who was responsible (by name and by job description or title). Other evidence that Evans was not acting as an acceptor is that she did not execute the acceptor's blank on Robertson's form, but instead she drafted her careful response.

The negotiations never resulted in a document or series of documents signed by the party to be charged with their performance sufficient to take the case out of the statute of frauds, being a contract for the sale of realty. It is possible to take a series of letters and assimilate them into a document that covers all of the terms of the transaction and that is signed by the party to be charged with the obligation. These do not.

12. *Breach by FDIC.*

■ If there were a contract, has it expired, been breached, or otherwise come to naught? The answer is: If it is a contract, it has come to naught. It died for Robertson because his remedy, under the terms of the contract that he proposes, would be to recover his earnest money, which under this contract, is 65% of $1,040.

The bank cashed four checks for $1,200. The FDIC cashed one check for $1,040, for a total of $5,840. Under the contract, 65% of the $1,040 would have been earnest money. That paragraph was, in essence, a lease-purchase with the option to convert part of the lease payments to the purchase price; it was not really earnest money. There is not much earnestness in paying the FDIC what you owe them in the first place and taking credit for it. Assuming it was a contract, then the sole remedy would be the recovery of 65% of $1,040. Even if the remedy of specific performance were not foreclosed by the contract, if it were a contract, specific performance is statutorily unavailable against the United States.

13. *Breach by Inducto–Bend.*

Now, even in the alternative, Robertson would not get the money because, if this is a contract, it was not the FDIC that would have breached it.

Inducto–Bend has tried to make something of substance of its status as a beneficiary of the contract. Robertson, Trustee, by the rent as earnest money, became an obligor to pay the rent. After all, it was Robertson, Trustee, who was to make an earnest money deposit, not Inducto–Bend. The agreement was that Inducto–Bend's rent would be credited, but in the absence of its having been made, it seems that, from the contract, Robertson, Trustee, was obliged to make the earnest money deposit that Inducto–Bend failed to make as rent; therefore, the contract would die if it had been a contract on the second ground of nonpayment of rent post contract to serve as earnest money.

### 14. *Reasonable Time.*

■ If it did not die then, and if it were a contract, it would die within a reasonable period of time, which the court will take, under the circumstances of the FDIC's response time and the known pendency of litigation, to have been six months from the date of the putative contract in which time Robertson should have attempted to obtain a commitment for title insurance that (a) would have triggered the 45 day closing period or that (b) would have told the FDIC what it needed to do to prepare the title in a suitable form so that Robertson would believe that the property had become "available for sale" under the putative contract.

The agreed assignment of the leases and the credit of the rent against the purchase price during the pendency of the sale in no way is a ratification by the FDIC of the leases or sublease. The contract did not affirmatively place the duty on either party to obtain by any specific date a title commitment, but since the purchaser is the person who has the right to object to title defects, it becomes the responsibility of the purchaser to be in a position to object at least within six months.

The terms of their putative contract required Robertson to advance earnest money but gave him no right to specifically enforce it. An executory contract that does not allow the prospective buyer to specifically enforce the contract is no more than an option to purchase, not a firm, enforceable contract to sell. As an option to purchase, the agreement grants Robertson no additional estates and, therefore, no power to sublet the property.

### 15. *Equity.*

■ There has been an argument of general waiver or estoppel by Inducto–Bend and Robertson. The court made several derogatory comments about the FDIC, which were not findings or holdings in this case; I do not imagine that it is easy to deal with the government as a receiver for an incompetent bank. I do not imagine it is easy to be the receiver for an incompetent bank. Robertson has complained at length and with feeling about the bank and FDIC's failure to communicate with him, their failure to respond to his letters. The record, on the other hand, reflects a moderately slow and appropriately cautious form and time of response by the FDIC in dealing with wide ranging assertions of differing facts and legal conclusions by Robertson, in his own interest and for Inducto–Bend, when, of course, as a subtenant and occupier of the property, he was in a position to know as much or more than the FDIC about what arrangements had been made and when they had been made.

Confusion by the FDIC about which provision of which lease controlled and whether the escalation of the sublease had occurred seems perfectly normal. It needed to be worked, but nothing that the FDIC did contributed anything to the detriment of Inducto–Bend. Far from crippling Inducto–Bend, the FDIC's glacial actions in this case have allowed it to occupy the premises for over three years, having paid five months' rent. That is not the stuff of which estoppel is made.

### 16. *Moving Expense.*

■ For the sake of completion of the record and with no indication that recovery is remotely possible, the court finds it would cost Inducto–Bend approximately $25,000 to move. There will be no recovery of that amount because it is not a recovera-

ble amount and because it is not entitled to it, there having been no breach of any duty by the FDIC. There is no finding of any expectancy valuation because there is no evidence of a differential between the rent that Inducto–Bend had a right to pay for the occupancy and what price an alternative site would cost. That would be a proper measure of damages if the lease had been ratified. So, if the lease was ratified, there are still no damages under the breach of the lease by the FDIC, since there is no evidence of what the rate differential is. At the risk of belaboring the obvious, the lease, of course, has expired, in any event, at this point. There has been no evidence and no argument that the FDIC has renewed or extended or entered into a new lease for those premises with either Inducto–Bend or Robertson.

17. *Robertson's Contract Damage.*

If there were a contract for the sale of the property and if it were breached by the FDIC and if the damage limitation clause in the contract were not effective, then Robertson would be entitled to one of two measures of damage, his reliance costs or his expectancy. Again, there is no evidence about the difference between the contract price and the fair market price either at the time when the closing should have occurred or at the time of the contract. There is no evidence of an expenditure in reliance on the contract of sale by Robertson, including no expense related to performance of the contract, much less any broader reliance or consequential damages.

18. *Conclusion.*

The FDIC will have judgment for title and possession of the land against Inducto–Bend and Robertson. It will recover the past due rents plus six percent prejudgment interest and current rents from the judgment. This judgment for title does not affect any third-party non-occupant encumbrances that may exist. This judgment for possession is wholly supplementary to the

judgment for possession of October 31, 1990.